## ANDREW STEWART *v.* HIS CREDITORS.

The receipt by a husband residing abroad, of money belonging to his wife, does not entitle the wife to a legal mortgage on property acquired by the husband in this State after their subsequent removal to it.

APPEAL from the Sixth District Court of New Orleans, *Cotton*, J.

*G. & C. E. Schmidt,* for *Mrs. Stewart*, appellant.    *H. R. Dennis,* for Syndic, appellee.

LEA, J. *Andrew Stewart*, an insolvent debtor, made a surrender of his property for the benefit of his creditors. Portions of the property surrendered consisted of real estate situated in the parishes of Orleans and Jefferson, which had been specially mortgaged to different creditors.

In these conventional mortgages *Mrs. Stewart*, the wife of the insolvent, had intervened, and made the usual renunciation of the legal mortgage in favor of married women for the reimbursement of their dotal and paraphernal effects. The Syndic, in due course of administration, sold the property surrendered, and the litigation now before us arises out of the contest for the distribution of the proceeds. *Mrs. Stewart* is appellant from a judgment rejecting her claim to be paid in preference to the creditors by special mortgage.

The appellant avers that she was married to *Stewart* in Alabama in 1845; that her husband then resided at Tampico, in the Republic of Mexico, to which place she went with her husband immediately after her marriage, and where she continued to reside until their removal to this State; that her father died in 1849, leaving a will, by which he instituted her sole heiress of his estate, which was composed of real and personal property, amounting in value to $25,000, all which was received by her husband between the years 1849 and 1854, for the restitution of which she avers that she has by law a legal mortgage, not only by the laws of this State but by the laws of Mexico, which was the place of the intended matrimonial domicil at the time of her marriage.

She further avers that the pretended renunciations in favor of the creditors by special mortgage, if any such exist, were informal and illegal, never having been read or explained to her before obtaining her signature, or before the failure of her husband.

We think it is established by the evidence that the appellant was married in Alabama, in 1845, to *Andrew Stewart*, who then resided in Tampico, to which place she and her husband repaired immediately after the marriage; that the father of the appellant died in 1849, leaving to her his whole estate, with the exception of certain specified legacies; that in the same year *Stewart*, acting as administrator, sold the whole of the property, real and personal, for the sum of $8802, of which he rendered an account at the time. Subsequently, on the 14th April, 1851, he rendered another account, showing a balance of $5063 25 in favor of his wife. These proceedings were all conducted in Alabama, where the estate of the father was opened.

It does not appear from the evidence when *Stewart* and his wife removed to this State, but we think it is satisfactorily shown that *Stewart* did not receive any portion of the proceeds of the estate of *Randall* after he removed to this State. Under this state of facts we think but one question is presented for our

12

solution, viz: Does the receipt by a husband residing abroad, of money belonging to his wife, entitle her to a legal mortgage on property acquired by him after a subsequent removal to this State? If this question is to be answered in the negative, it is unnecessary to inquire whether the renunciations made by the appellant in favor of the special mortgagees are valid or not.

It is not material to inquire what the laws of Mexico provide with reference to the rights of married women. The laws of a foreign country cannot of themselves confer any rights upon real estate situated in Louisiana. The relations of parties, and the rights incident to those relations, will be recognized and enforced as being of a binding character everywhere, except in cases where their enforcement is disregarded from considerations of public policy or convenience; but *remedial* or accessory rights conferred merely by the laws of a foreign nation can have no force or vitality within the limits of any other independent sovereignty. The question, therefore, must be examined with reference exclusively to our own legislation on this subject.

The 2367th Article of our Code provides that in cases where it is proved that the husband has received the amount of the paraphernal property alienated by the wife, or otherwise disposed of the same for his individual interest, the wife shall have a legal mortgage on all the property of her husband for the reimbursing of the same.

The mortgage exists independently of any registration, and takes precedence of conventional and judicial mortgages of a subsequent date, even though the latter may be registered. Analogous provisions in the laws of France have divided the opinions of their jurists upon the issue presented in this case. Troplong and Merlin concur in the doctrine that a minor or married woman, even though not a resident of France, have, for the security of their rights as such, a legal mortgage on the property of their tutors or husbands situated in France. See Troplong Priv. et Hyp. vol. 1, p. 247, also Merlin, verbo Remploi.

On the other hand, Duranton and others broadly announce the doctrine that the laws of France are made for the protection of French subjects and not for foreigners    19 Duranton, 418.

The first named commentators base their opinion upon the principle that the law which subjects property to a tacit mortgage is a real statute and therefore affects immovable property, without reference to the residence of those who seek to enforce those claims upon it. We certainly do not wish to place our dissent from this opinion, as applicable to property situated in this State, upon a recognition of the narrow and inhospitable doctrine which appears to have contracted the views of the last named commentators. In so doing we should violate all the precedents of our own jurisprudence. Our laws are not framed exclusively with reference to the rights of our own citizens.

On the contrary, our reports are full of decisions in which the privileges conferred by our laws have been extended to contracts made out of the State, without distinction among creditors, whether dependent upon the place of the origin of the debts or the residence of the creditors. But every law must be construed, not only with reference to the policy which dictated it, but in connection with similar legislation on the same subject. In imposing such an incumbrance upon real estate as that which necessarily results from legal and tacit mortgages, the Legislature evidently contemplated the protection of a class of persons who were unable to protect themselves, and whom they were therefore bound to protect. For this reason they have subjected the rights of their own citizens

to incumbrances which, though of doubtful policy, it cannot be supposed were intended to operate in favor of those whom it was no part of their duty to protect.

It is the duty of the State to protect its own widows and orphans and those of its own people who are laboring under legal incapacities. Accordingly, in our Code, we find a system of legal mortgages in favor of married woman, minors, interdicted persons and even absentees, whose property is the subject of *administration in this State;* but upon what principle of public policy, or even of common justice, could the rights of mortgage creditors in this State be postponed to the claims of an interdicted person residing in France upon the property of his curator situated in this State, for an indebtedness growing out of an administration in that country? And the case would not be altered in principle, even though the curator should subsequently have removed to this State.

In the language of the decision in the case of *Pratt* v. *His Creditors*, in 12 Rob., 508: "We cannot adopt a conclusion so injurious to the rights, the interests and the convenience of our citizens, unless it be forced upon us by some stern and unbending provision of law." But from a review of the various Articles of the Code on the subject of legal mortgages, it appears to us that they point conclusively, not only to the supposed residence in the State of the party whose property is sought to be subjected to their operation, but to the security of a debt originating in the State. Thus provisions are made for the registration of these mortgages, and it is made the duty of tutors, curators of interdicted persons, and also of husbands, to make known the existence of such mortgages, by having them recorded—a provision necessarily inapplicable to non-residents.

The whole tenor of our legislation on this subject appears to us to repel the idea that it was in contemplation of the Legislature to extend the operation of our system of legal and tacit mortgages to cases where the debt itself originated out of the State, at a time when the debtor was also a non-resident. See, on this point, the case of *Arnold* v. *McBride*, 6 An. 703.

Judgment affirmed.